Eldon T. TINSLEY, Movant–Appellant,

v.

STATE of Missouri, Respondent–Respondent.

No. 28574.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 8, 2008.

---

Mark A. Grothoff, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., and Dora A. Fichter, Assistant Attorney General, Jefferson City, MO, for Respondent.

GARY W. LYNCH, Chief Judge.

Eldon Tinsley ("Movant") appeals the

denial of his Rule 29.15[1] motion for post-conviction relief alleging ineffective assistance of counsel. He specifically argues that his trial counsels failed to act reasonably when they declined to call a witness Movant asserts would have provided him a defense to the underlying charge of first-degree murder. In a *pro se* supplemental brief, Movant further argues that the motion court erred in its cursory denial of three claims raised in Movant's original *pro se* Rule 29.15 motion, but omitted from his amended motion. We affirm.

### Factual and Procedural Background [2]

On May 9, 2001, Myung Kyu Kim ("Victim") entered the American Bank in Baxter Springs, Kansas, and attempted to cash three checks Movant had given him in exchange for various goods.[3] Upon presenting the checks, Victim was told by the bank teller that Movant's bank account had been closed for three years and that she could not honor the checks. Victim was advised by the Baxter Springs police department to contact the police department in Joplin. Instead, Victim went to Movant's home in Joplin to get either his money or his merchandise from Movant.

By chance, Movant's daughters, Cheena and Tonya, arrived at Movant's house around 10:00 a.m. that morning. Neither lived with Movant. They found Victim waiting outside the home. Both Cheena and Tonya recognized Victim from his previous dealings with Movant. Tonya knocked on Movant's door and then called

Movant from Victim's cellular phone, but Movant would not come to the door. After waiting about ten minutes, Cheena and Tonya left.

Victim then called his girlfriend, Hyang Park ("Park"), in Texas and told her that he was at Movant's house; that Movant would not answer the door; and that he was going to wait for Movant to come out.

At around noon, Victim phoned Park again. This time, Victim told Park that he was inside Movant's house and he wanted Park to speak to Movant about getting the money Movant owed him. Park then spoke with Movant and informed Movant that he needed to deal with his bank; Movant told her that he would. After Movant gave the phone back to Victim, Park, who was "feeling sort of strange" about the situation, asked Victim for Movant's phone number, which he gave her. When Park called Victim at Movant's home five or ten minutes later, there was no answer.

At around 2:00 or 2:30 that afternoon, Tonya phoned Movant from a friend's home to see if she had any messages waiting for her. Immediately after they ended their conversation, Movant called Tonya back at her friend's home. Sounding out of breath, Movant told Tonya that he needed her to come to his home and that he wanted her to come alone.

When Tonya arrived at Movant's home, "he told [her] that he ha[d] something really important to tell [her]. And that he was trusting [her] with his life. And that

---

1. All references to Rules are to Missouri Court Rules (2005), unless otherwise indicated.

2. In *State v. Tinsley,* 143 S.W.3d 722 (Mo. App.2004), this Court affirmed Movant's judgment of conviction on the offense giving rise to his motion for post-conviction relief. We borrow freely from that opinion without any further attribution.

3. Kim, a native of South Korea who resided in Irving, Texas, made his living by traveling through a tri-state area selling merchandise such as t-shirts, sunglasses, and watches to the public at wholesale prices. He often sold merchandise to Movant, who would then re-sell the items at the Joplin flea market.

he had killed somebody." Movant then told her that he had gotten into an argument with Victim and had killed him. Knowing that Movant kept a 9–millimeter gun in his filing cabinet, Tonya asked Movant if he shot Victim. Victim responded by telling her that "it was none of [her] business." Tonya did not see Victim's body, but she did observe some blood in the laundry room.

Movant wanted Tonya to help him dispose of the contents of Victim's truck and asked her to meet him at Stowaway Storage. On the way to the storage unit, Tonya stopped to see her friend Kim Clevenger ("Clevenger"). She told Clevenger that she would be back to pick her up later. Tonya informed Clevenger that her father had killed someone and she had to help him unload a truck.

At approximately 3:00 p.m., Movant rented a storage unit at Stowaway Storage, and he and Tonya placed the contents of Victim's truck inside the unit. They then parked Victim's truck in the Wal–Mart parking lot and abandoned it there. While at Wal–Mart, Movant and Tonya purchased a padlock for the storage unit.[4] Movant and Tonya returned to the storage unit to place the lock on the door and then went back to Movant's home at about 4:30 p.m.

Upon arriving at Movant's home, Movant told Tonya that he was going to Mike Hatten's ("Hatten") auction house to buy a metal drum and that he wanted her to come back to his house at 9:00 p.m.[5] Tonya then went to see Clevenger and later visited with Cheena. Tonya told both of them what had happened that day. According to Cheena, Tonya and her boyfriend, Tim Avey ("Avey"), arrived at her house at around 6:00 p.m.

At some point in the late afternoon, Clevenger went to the Joplin police department to report Victim's murder. Based upon Clevenger's information, the police placed Movant's home under surveillance. Officer James Altic testified that Movant arrived home in a maroon van. After parking the van, Movant began unloading its contents and carrying items into his home. After ten to fifteen trips into the house, Movant emerged with a metal drum on a dolly. Wearing latex gloves and struggling with the drum, Movant wheeled the dolly to the carport and set it down by the maroon van. As Movant entered the van, he was surrounded by police. When the police removed the lid of the drum, they discovered Victim's body inside.

An autopsy showed that Victim died of a close range gunshot wound to the head. Through the use of luminal,[6] the police detected the presence of blood in Movant's dining room, kitchen, bedroom hallway, and bathroom sink; there was visible blood in the doorway between the kitchen and the bedroom. Police recovered a 9–millimeter bullet from a hole in the kitchen wall that later was proven to have been fired from the 9–millimeter Ruger found in Movant's dresser drawer. Police discovered Victim's wallet, passport, and 113 boxes of merchandise in the storage unit rented by Movant. Further, the towel used to wrap Victim's body matched the towels in Movant's bathroom, and Victim's empty truck was found in the Wal–Mart parking

---

**4.** The Wal–Mart store surveillance tapes showed Tonya entering the store at 3:28 p.m. that day.

**5.** Hatten testified that Appellant purchased a large metal barrel from him at around 4:30 p.m. that day and loaded the barrel into the trunk of his Lincoln Towncar.

**6.** Luminal is a chemical that reveals the presence of blood that cannot be detected with the naked eye.

lot. After Movant's arrest, Tonya and Cheena moved into his house. Shortly after moving in, Tonya found Victim's cellular phone on a shelf in Movant's closet and turned it over to police.

After a jury trial, Movant was convicted of first-degree murder in violation of § 565.020.[7] In accordance with the jury's recommendation, Movant was sentenced to life imprisonment without the possibility of parole. This Court affirmed Movant's conviction. *See State v. Tinsley,* 143 S.W.3d 722 (Mo.App.2004).

Movant filed a *pro se* Rule 29.15 motion for post-conviction relief containing thirty-nine claims. The motion court appointed Movant counsel shortly thereafter, and his appointed counsel filed an amended motion. The amended motion made one claim: trial counsels' ineffective assistance in failing to call Clevenger as a witness on Movant's behalf. The motion court held an evidentiary hearing on the issue raised in the amended Rule 29.15 motion. In support of his amended motion at that hearing, Movant presented Clevenger's live testimony, as well as the depositions of his trial counsels, and various police documents regarding Clevenger's statements to law enforcement. Following the presentation of evidence, the court acknowledged that Movant had filed a *pro se* motion requesting an evidentiary hearing be held regarding the points asserted in his original *pro se* Rule 29.15 motion. The motion court indicated that it would review Movant's filing before rendering its opinion. The court then took the matter under advisement and thereafter issued its written judgment with findings of fact and conclusions of law denying Movant any relief. In addition to its denial of the one claim in Movant's amended motion, the motion court briefly addressed the claims from Movant's original *pro se* motion, denying all without evidentiary hearing.

Movant then filed a timely notice of appeal with this Court. Movant's counsel subsequently filed a brief challenging only the motion court's denial of the one claim presented in Movant's amended Rule 29.15 motion. Movant then requested, pursuant to this Court's Local Rule 6, leave to file a *pro se* supplemental brief "on the pro se grounds preserved for appellate review[.]" This Court granted Movant's request, and Movant filed a *pro se* supplemental brief raising three additional points of alleged motion court error.

### Standard of Review

In reviewing appeals of Rule 29.15 motions for post-conviction relief, this Court is limited to determining whether the findings of fact and conclusions of law of the motion court are clearly erroneous. Rule 29.15(k); *Glass v. State,* 227 S.W.3d 463, 468 (Mo. banc 2007). The "[f]indings and conclusions [of the motion court] are clearly erroneous if, after a review of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Moss v. State,* 10 S.W.3d 508, 511 (Mo. banc 2000). It is the movant's burden to prove his claims for relief by a preponderance of the evidence. Rule 29.15(i).

### Discussion

We address Movant's points in the order presented.

### Failure to Call Witness Not Ineffective Assistance of Counsel

■ Movant first contends that the motion court erred in denying his amended Rule 29.15 motion because trial counsels' decision not to call Clevenger as a wit-

---

7. All statutory references are to RSMo 2000, unless otherwise indicated.

ness was unreasonable, and amounted to ineffective assistance of counsel. In particular, Movant argues that Clevenger's testimony would have mitigated Movant's actions in killing Victim by demonstrating that Movant "acted under the influence of sudden passion arising from adequate cause, thereby providing a viable defense to both first and second-degree murder." We disagree.

In order to succeed on a claim of ineffective assistance of counsel, a movant must demonstrate by a preponderance of the evidence that his or her trial counsel "failed to exercise the customary skill and diligence that a reasonably competent attorney would perform under similar circumstances," and that counsel's actions, or lack thereof, prejudiced the movant in some way. *Evans v. State*, 239 S.W.3d 191, 194 (Mo.App.2007) (citing *State v. Simmons*, 955 S.W.2d 729, 746 (Mo. banc 1997)). *See also Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail on the first, or performance, prong of this standard, the movant "must overcome the presumptions that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment." *Simmons*, 955 S.W.2d at 746 (citing *Strickland*, 466 U.S. at 689–90, 104 S.Ct. 2052). In order to satisfy the second, or prejudice, prong of this standard, the movant must establish "a reasonable probability that the outcome of the proceeding would have been different but for counsel's ineffectiveness." *Evans*, 239 S.W.3d at 194 (citing *Simmons*, 955 S.W.2d at 746). Both prongs are necessary for a finding of ineffective assistance; if either is not met, this Court need not consider the other, and the movant's claim must fail. *Id.*

■ When claiming ineffective assistance of trial counsel for failing to call a witness, the "movant must show that the witness could have been located by reasonable investigation, that the witness would [have] testif[ied] if called, and that the testimony would [have] provide[d] a viable defense." *Bucklew v. State*, 38 S.W.3d 395, 398 (Mo. banc 2001). The movant must further establish that the outcome of the case could have been different had the witness testified and that counsel's failure to call the witness was not simply trial strategy. *Bewley v. State*, 151 S.W.3d 151, 153–54 (Mo.App.2004). As a rule, "[t]he selection of witnesses and evidence are matters of trial strategy," and are considered "virtually unchallengeable in an ineffective assistance claim." *Williams v. State*, 168 S.W.3d 433, 443 (Mo. banc 2005). Moreover, it is well-established that trial counsel is given "wide latitude in defending a client in matters regarding trial strategy." *Worthington v. State*, 166 S.W.3d 566, 578 (Mo. banc 2005).

■ In the case at bar, Movant maintains that, had the jury heard Clevenger's testimony, it likely would have reached a different verdict and, as such, counsels' decision not to call Clevenger cannot be considered reasonable trial strategy. The record does not support such a conclusion. As Movant's trial counsels made clear, the defense theory throughout the trial was that Movant did not commit the underlying crime, that he was not present during the commission of the crime, and that in fact his daughter, Tonya, had killed Victim and he only helped her clean up afterward. Counsel made the decision to pursue this particular theory—which aligns with Movant's claim to his trial counsels that he did not kill Victim—after consultation with Movant. Clevenger's claim that she was present at Movant's home during the commission of the crime and saw Movant standing over Victim with a gun and covered in blood was thus in direct contra-

diction to Movant's own narrative of events to his counsels and his theory of defense. " 'If a potential witness's testimony would not unqualifiedly support a defendant, the failure to call such a witness does not constitute ineffective assistance.' " *Worthington*, 166 S.W.3d at 577 (quoting *State v. Jones*, 885 S.W.2d 57, 58 (Mo.App. 1994)).

In addition, trial counsels further explained that their decision was in part based on Clevenger's questionable credibility; examination of Clevenger's deposition and various statements to police, as well as Tonya Tinsley's testimony, indicate that Clevenger's credibility would indeed have been a major issue had she been called to testify at trial. When Clevenger went to the Joplin police department on the afternoon of May 9, 2001, she told the interviewing officer that she and Tonya had gone to Movant's house to help him load his truck with merchandise for the flea market, but when they got there, Movant was arguing with Victim. Clevenger told police that she and Tonya had just stepped outside when they heard a gunshot, and they returned inside to see Movant standing over Victim, covered in blood and holding a gun. She went on to say that Movant had asked the two girls to return later that night to help him get rid of the body. Joplin police relied on this information in obtaining a search warrant for Movant's home.

Clevenger repeated this narrative of events the next day while giving a voluntary statement to police, albeit with a few added details, but her story changed on May 11, 2001, during a second voluntary statement. At the second interview, Clevenger told detectives that she had not been at the house during the murder; instead, Clevenger said that she and Tonya had been with various friends throughout the day and that, after he killed Victim, Movant called Tonya to have her come help him clean up and dispose of the body. She went on to say that Tonya had provided her with the details of the crime while the two girls drove to Clevenger's boyfriend's apartment. Finally, Clevenger told police that the story she had given during both her initial report to police and her first interview was what Tonya had told her to say if Clevenger had to talk to the police, and that she obliged because Tonya was her friend and she did not want her to get in trouble.

Clevenger's story reverted back to her initial report to police during her deposition in August of 2002, when she once again claimed that she had been present at Movant's home during the killing and had witnessed Movant standing over Victim, covered in blood and holding a gun. At the evidentiary hearing, Clevenger stated that, had she been called as a witness at trial, she would have repeated her deposition testimony.

Movant's trial counsels testified that they expected the State to call Clevenger as a witness because she could place Movant at the scene and that they were prepared to cross-examine her based on her inconsistent statements. Counsels further testified that when the State did not call Clevenger, they met with Movant and, after discussing the situation with him, decided not to call Clevenger because it would hurt his planned defense by placing him at the scene—the precise reason Movant now contends that he *should* have called Clevenger as a witness—and because she could be too easily impeached by the State. In other words, trial counsels decided that presenting one consistent defense was a better course of action than two conflicting ones. Such a logical, strategic decision cannot now be found unsound. *See State v. Borders*, 844 S.W.2d 49 (Mo.App.1992) (no ineffective assistance found where counsel interviewed potential witnesses and determined them not to be

credible, and their potential testimony did not support the defendant's central theory of defense). Because counsels' actions were the result of reasonable trial strategy, we need not address the prejudice prong. Movant's first point is denied.

### Movant's Pro Se *Supplemental Points Relied On*

■ In his *pro se* supplemental brief, Movant presents three points for our consideration: (1) that the trial court erred in sustaining the State's objection to Movant's cross-examination of Officer Brian Lewis regarding Tonya Tinsley's statements to police; (2) that Movant's appellate counsel on his direct appeal was constitutionally ineffective for failing to raise Movant's preceding point on direct appeal; and (3) that the motion court erred when it declined to hold an evidentiary hearing regarding the points raised in Movant's original *pro se* Rule 29.15 motion, particularly those points regarding the failure to call specific witnesses on Movant's behalf at trial. Because these points were not properly before the motion court for its consideration and determination, nothing is presented for appellate review.

Movant filed his original *pro se* Rule 29.15 motion for post-conviction relief containing thirty-nine claims on December 29, 2004. On January 7, 2005, the motion court appointed counsel for Movant, who subsequently filed a motion for an extension of time to file an amended motion. Counsel then filed an amended motion for post-conviction relief on April 7, 2005, which contained only one claim. The motion court eventually held an evidentiary hearing on January 26, 2007.

Rule 29.15(i) provides, in pertinent part, that: "[t]he hearing ... shall be confined to the claims contained in the last timely filed motion." Rule 29.15(i); *see, e.g., Johnson v. State*, 210 S.W.3d 427, 432 n. 5 (Mo.App.2006) (It is a "settled rule that

the filing of an amended motion by post-conviction counsel supersedes a movant's *pro se* motion and renders it a nullity."); *Day v. State*, 143 S.W.3d 690, 693–94 (Mo. App.2004) ("[T]he allegations of a timely-filed amended motion would be the only matters before the motion court."); *Norville v. State*, 83 S.W.3d 112, 114 (Mo.App. 2002) ("When an amended motion is filed, issues that were set forth in a previous *pro se* motion, but which are not included in the amended motion, are not for consideration.").

Here, the last timely-filed motion was the amended motion filed April 7, 2005, as both the request for an extension of time and the subsequent filing of the amended motion on Movant's behalf by motion counsel were within the time requirements of Rule 29.15(g); indeed, the timeliness of the amended motion in not challenged in this appeal. Thus, the only claim which the motion court could have considered and determined was that raised in the amended Rule 29.15 motion for post-conviction relief. *Johnson*, 210 S.W.3d at 432 n.5; *Day*, 143 S.W.3d at 693–94; *Norville*, 83 S.W.3d at 114. The filing of an amended motion superseded Movant's pro se motion and rendered it a nullity. *Johnson*, 210 S.W.3d at 432 n. 5. Thus, any purported ruling by the motion court based on Movant's pro se motion is also a nullity and presents nothing for appellate review. The three points raised in Movant's *pro se* supplemental brief are therefore dismissed.

### Decision

For the foregoing reasons the judgment of the motion court is affirmed.

BURRELL, P.J., and PARRISH, J., concur.